DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**M.J.G.,** the Mother,
Appellant,

v.

**A. JULIA GRAVES,**
Appellee.

No. 4D21-1675

[January 5, 2022]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Indian River County; Cynthia L. Cox, Judge; L.T. Case No. 312020DR000518.

Nikie Popovich of Popovich Law Firm, P.A., Orlando, for appellant.

A. Julia Graves of Law Office of A. Julia Graves, P.A., Vero Beach, for appellee.

CIKLIN, J.

M.J.G. ("the mother") timely appeals a "Final Judgment of Termination of Parental Rights for Purpose of Adoption of Minor Child" entered in favor of A. Julia Graves, the adoption entity ("the intermediary"). Specifically, the mother challenges the trial court's denial of her motion to withdraw her consent. She argues the trial court erred by determining she did not meet her burden of proving that the consent was the product of duress by the father's conduct and the intermediary's conduct and statutory violations. Recognizing that our standard of review is abuse of discretion, we affirm.

This appeal arises from a termination of parental rights (TPR) action for the purpose of adoption, whereby the trial court entered judgment terminating the parental rights of the mother and the father based on their respective consents to adoption.

The mother discovered she was pregnant in late April 2019, approximately five months into her pregnancy. She attempted to contact

the father concerning the pregnancy, but the father did not respond to her calls and messages.

In June 2019—after still not hearing from the father—the mother considered adoption and contacted an agency known as "Heart of Adoptions" ("HOA"), which is not a party to this action. HOA provided the mother with a written disclosure form, obtained her signed acknowledgment, and gathered information regarding her social and medical history. As part of the process with HOA, the mother was informed of all alternatives to adoption. The mother voluntarily chose a family in Michigan and accepted at least $3,000 from the Michigan family. HOA also contacted the father concerning the adoption and mailed him the disclosures.

Some weeks after the initial contact, the father finally responded to the mother's messages and proposed that any arrangements with the Michigan family be abandoned and that the father's cousin and the cousin's fiancée adopt the child. In doing so, the father insinuated that an adoption by his family members would allow the mother to see the child in the future. The cousin and her fiancée hired the intermediary to facilitate the adoption and promised the mother $5,000 and additional funds to cover her expenses. Up until the time the child was born, the father continued to encourage the mother to allow his cousin to adopt the child. The mother ultimately canceled the adoption process with the Michigan family.

On July 17, 2019, the mother gave birth to a boy. Prior to giving birth, the mother notified the intermediary that she was being induced. The mother notified the father of the child's birth, sent the father a picture of the child, and wrote: "I'm scared of losing him forever," and "I asked [the intermediary] if they would let me visit him." The father texted to the mother: "But you are not [losing] him[,] he will be around," and "[b]ut he is going to be very close to us both."

The mother spent two full days with the child in the hospital. On the morning of July 19, 2019, the intermediary brought the consent documents to the hospital. After several hours of deliberation and discussions with the mother's brother, who was present at the hospital, the mother changed the child's clothes, packed his bag for departure, and signed the consent to release the child to the intermediary as the adoption entity.

2

After the mother left the hospital, the intermediary delivered part of the promised $5,000. At that time, the mother did not advise the intermediary that she had changed her mind.

On the evening of July 19, 2019, the mother emailed the adoptive parents and urged them to "love him, protect him, don't let anything happen to him[.] I want to be able to be in his life."

During the morning of July 20, 2019, the mother texted the father indicating that the mother thought she had made "a mistake."

In June 2020, the intermediary petitioned to terminate the mother's and father's parental rights. As grounds, the intermediary contended that each parent had executed a valid consent, but it noted that the mother was now challenging the validity of her consent, making the termination contested. The mother moved to withdraw her consent on July 21, 2020, contending that her consent "was obtained by fraud; is fundamentally flawed because it does not comport with the adoption statutes; and the adoption entity violated the Mother's due process rights when obtaining the consent."

A final judgment terminating parental rights for the purpose of adoption of the minor child was entered in April 2021. The mother appeals.

On appeal, the mother argues the trial court erred because she presented clear and convincing evidence that her consent was the product of duress. The intermediary argues its evidence revealed that the mother was fully informed and simply regretful as she signed a disclosure of her rights with HOA.

This court reviews the denial of a motion to withdraw consent to adoption for an abuse of discretion. *See W.T. v. Dep't of Child. & Fams.*, 846 So. 2d 1278, 1281 (Fla. 5th DCA 2003). "If reasonable [persons] could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion." *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980).

"A parent who seeks to invalidate his or her purported consent to the termination of parental rights has the burden of proving fraud or duress by clear and convincing evidence." *T.G. v. Dep't of Child. & Fams.*, 9 So. 3d 48, 49 (Fla. 4th DCA 2009) (affirming denial of motion to withdraw surrender of parental rights where, prior to accepting surrender, the court engaged in "thorough colloquy" with mother explaining the surrender's permanency). This court has defined duress as "[a] condition of mind

3

produced by an improper external pressure or influence that practically destroys the free agency of a party and causes [them] to do an[] act or make a contract not of [their] own volition." *K.C. v. Adoption Servs., Inc.*, 721 So. 2d 811, 812 (Fla. 4th DCA 1998) (quoting *Herald v. Hardin*, 116 So. 863, 864 (Fla. 1928)). To prove duress, "it must be shown (a) that the act sought to be set aside was effected involuntarily and thus not as an exercise of free choice or will and (b) that this condition of mind was caused by some improper and coercive conduct of the opposite side." *Id.* (quoting *City of Miami v. Kory*, 394 So. 2d 494, 497 (Fla. 3d DCA 1981)).

The trial court entered a thorough and well-reasoned order denying the mother's motions to dismiss the TPR petition and withdraw her consent. In part, the trial court reasoned:

> I. The Mother spent two full days with the baby. On July 19, 2019, <u>the Mother notified</u> [the intermediary] that it was okay to come to the hospital. On the same date, [the intermediary] brought the consent to the hospital. The Mother texted the Father at 11:57 a.m. "[The intermediary] has been here twice, *I couldn't get myself to sign papers yet*, I'm scared of losing him forever." Notwithstanding, the Mother signed the consent on July 19, 2019 at 3:45 p.m. after several hours of deliberation and discussions with her brother, . . . who was present. The consent was witnessed by [a notary], [the intermediary], the Mother's brother, . . . and the Father. The Mother has a college education and can read, write and understand English. Prior to signing the consent, the Mother never articulated that she had changed her mind, had second thoughts or did not want to go through with the adoption . . . . only that she wanted more time and wanted her brother present. She was given the time she needed and admitted and acknowledged that she fully knew what she was signing and that she voluntarily and knowingly relinquished her rights to her newborn baby. The Mother changed the child's clothes, packed his bag for departure and signed the consent to release the child to [the intermediary] as the adoption entity. Although clearly the Mother had a tough decision, she weighed her options, discussed her options and no one pressured her or prevented her from leaving the hospital with her baby and abandoning the adoption.
>
> . . . .

T. The Mother claims that her written consent was obtained by fraud or duress; is fundamentally flawed because it does not comport to the adoption statutes and the intermediary/adoption entity violated the mother's due process rights when obtaining the consent. Specifically, she asserts that she was manipulated; was not interviewed prior to the adoption; was not provided or explained the proper disclosure; was not told of alternatives to adoption or required counseling; that the child was placed in a home before the home study; failed to wait 48 hours for consent; and that adoption entity's address and telephone number were not listed in the consent nor was she provided a copy.

U. Procedural safeguards are in place to ensure biological parents are fully advised on the legal ramifications of consenting to an adoption and to prevent undue pressure from being exerted by the adoption entity. Although the Court finds that there were several procedural violations, the Mother freely and voluntarily contacted and worked with Hearts of Adoption, chose her adopters, was interviewed, completed the disclosures and was advised of alternatives to adoption. She thereafter *initiated* contact and reached out to [the intermediary] to come to the hospital. The Mother's consent was signed more than 48 hours after birth and the Mother was given additional time as requested prior to signing the consent. Section 63.2325, Florida Statutes, limits the Court's authority to revoke consent to an adoption based on a failure to comply with statutory requirements *unless the extent and circumstances of such failure result in a material failure to fundamental fairness in the administration of due process or failure constitutes or contributes to fraud or duress in obtaining the consent.* Due to the Mother's decision to change the adoption entity just prior to birth and the mistaken belief that it would be a relative adoption, not every detail of the statutory requirements were followed. However, the Mother was fully informed of her rights at least a month before the child was born to make her decision. Any prejudicial impact from non-compliance with the statutory requirements was unlikely and the record did *not* demonstrate that the Mother was denied fundamental fairness in the administration of due process. See also *J.S. v. S.A.*, 912 So.2d 650 (Fla. 4th DCA 2005)[.]

V. Section 63.082(4)(b), Florida Statutes, expressly provides that consent can be withdrawn *only if the court finds*

*that the consent was obtained by fraud or duress.* Duress is defined as a condition of the mind produced by an external pressure or influence that practically destroys the free agency of a party and causes him/her to do an act or make a contract not of his/her own volition. *T.G. v. DCF*, 9 So. 3d 48 (Fla. 4th DCA 2009). The Mother has the burden to prove fraud or duress by clear and convincing evidence. *J.S. v. SA*, 912 So. 2d 650 (Fla. 4th DCA 2005). Further, the Mother has the burden to prove by clear and convincing evidence that her "reliance on the promise was caused by some improper or coercive conduct of the opposite side." See also *T.R. v. Adoption Servs, Inc.*, 724 So. 2d 1235 (Fla. 4th DCA 1999); *KC v. Adoption Servs*, 721/811 (Fla. 4th DCA 1998); and *In Re: Adoption of Doe*, 524 So. 2d 1037 (Fla. 5th DCA 1988). The Mother's consent resulted primarily from her own financial issues rather than fraud or duress. Even though the Father pressured the Mother to place the child with his family in Florida *instead* of the Michigan couple, his behavior did not rise to the level of improper or coercive conduct necessary to prove duress. Once the Father learned of the baby, he had presented and offered several alternatives to adoption with the Mother, including a 50/50 custody and financial arrangement. There was no credible evidence that the Mother was ever promised visitation with the child; only that she inquired. . . . Based upon all of the facts and circumstances in this case, the Mother's decision to consent to the adoption was not due to reliance upon any of the Father's representations and consent to adoption cannot be withdrawn on a mere whim, change of heart or mistake. See *W.T. v. DCF*, 846 So. 2d 1278 (Fla. 5th DCA 2003); *In re: Adoption of P.R. McD*, 440 So. 2d 57 (Fla. 4th DCA 1983); and *J.S. v. S.A.*, 912 So. 2d 650 (Fla. 4th DCA 2005).

(footnote omitted).

We agree with the trial court's reasoning, and, under the specific facts of this case, we find no abuse of discretion. Consequently, we affirm.

*Affirmed.*

GROSS and DAMOORGIAN, JJ., concur.

\* \* \*

*Not final until disposition of timely filed motion for rehearing.*